**Affirmed and Memorandum Opinion filed February 6, 2024**



In The

# Fourteenth Court of Appeals

---

## NO. 14-23-00577-CV
## NO. 14-23-00622-CV

---

## IN THE INTEREST OF A.C. AND S.M., CHILDREN

## IN THE INTEREST OF A.R. AND N.R., CHILDREN

---

**On Appeal from the 310th District Court
Harris County, Texas
Trial Court Cause Nos. 2022-04427 & 2019-10672**

---

## M E M O R A N D U M   O P I N I O N

In these consolidated appeals, V.A.C. (Mother) appeals the trial court's final orders terminating her parental rights to her four minor children, A.R. (Ashley), N.R. (Nancy), A.C. (Adam), and S.M. (Sarah). F.M. (Frank) appeals the trial court's final orders terminating his parental rights to Sarah.[1] The trial court terminated Mother's and Frank's parental rights on predicate grounds of endangerment and failure to

---

[1] To protect the privacy of the minor children, we use pseudonyms to refer to the children and their biological parents. Tex. Fam. Code §109.002(d); Tex. R. App. P. 9.8(b)(2).

comply with the court-ordered service plan for reunification. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The trial court further found that the termination of parental rights was in the children's best interest. *See id.* § 161.001(b)(2). In four issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment findings, the trial court's finding on the predicate ground of failure to comply with the court-ordered service plan, the trial court's best interest determination, and the appointment of the Department of Family and Protective Services (the Department or CPS) as sole managing conservator of the minor children. Frank joins Mother's first three issues and also alleges that he received ineffective assistance of counsel. We affirm.

## *Background*

Mother is the biological mother of Ashley, Nancy, Adam, and Sarah. A.I.R. (Abraham) is the father of Ashley and Nancy; A.D.G. (Andrew) is the father of Adam; and Frank is the father of Sarah. This case began on January 23, 2022, when the children were taken into care after the Department received a "Priority 1" referral alleging physical abuse of Ashley. The following day, the Department filed suit to remove the children from Mother's care.

An eight-day jury trial commenced on June 21, 2023, and concluded on June 30, 2023. At the time of trial, Ashley was six years old; Nancy was five years old; Adam was three years old; and Sarah was about two years old. In its final orders, the trial court terminated the parental rights of Mother, Abraham, and Frank. Only Mother and Frank have filed an appeal.[2]

---

[2] The trial court found by clear and convincing evidence that Abraham executed an irrevocable affidavit of relinquishment of parental rights as provided by Chapter 161 of the Family Code. *See* Tex. Fam. Code 161.001(b)(1)(K). Abraham does not appeal the trial court's final decree terminating his parental rights. The trial court appointed Andrew as possessory conservator of Adam. Andrew does not challenge the trial court's final decree appointing the Department as

## I. The Trial

As stated, a jury trial was held over an eight-day period. The Department called several witnesses, including Mother and Frank. Mother expressed her desire not to testify because of a pending criminal case before proceeding with her testimony. When asked about the events leading up to the hospital, Mother explained that she lived in a two-bedroom apartment with her four children; her boyfriend, Frank; Frank's mother, Mary; and Frank's sister, Samantha (who is a minor child). On January 21, Mother was home with her four children, Frank, Mary, and Samantha. When Mother was getting Ashley ready for bed, she noticed a bruise on Ashley's leg and another on her back but did not see a bruise on her stomach. She also stated that Ashley vomited at some point before the "incident" occurred.

Mother described the incident as Ashley falling from a metal folding chair while playing in the dining room. Mother did not see Ashley fall from the chair because she was in the kitchen but suggested that it was because Ashley and Nancy were playing around at the dining room table. According to Mother, she found Ashley crying on the floor and folded in the middle of the chair. Mother stated that Frank did not see Ashley fall from the chair because he was in one of the two bedrooms with Adam and Sarah; Mary did not see the incident because she was in the shower; and Samantha did not see Ashley fall because she was asleep in the other bedroom.

The next morning, January 22, Mother woke up around 9:00 a.m. Ashley complained that her stomach was hurting and that she wanted to use the restroom but was unable to. Since Ashley was unable to urinate or defecate, Mother put Ashley in a diaper. Mother checked Ashley's stomach and noticed that it was bloated

---

sole managing conservator of Adam.

and bruised. She described the bruise as "not bigger than a quarter." Mother asserted that this was the first time she saw a bruise on Ashley's stomach. Mother decided to email Ashley's pediatrician and take Ashley to the hospital. Mother arrived at Memorial Hermann Southwest Hospital around 1:30 p.m. After some initial imaging, Ashley was transported to Memorial Hermann Children's Hospital because she needed an emergency surgery. During the transport, Mother rode in the front seat of the ambulance, and Ashley rode in the back with two paramedics. When Mother and Ashley arrived at Memorial Hermann Children's Hospital, Ashley was placed in a room, and Mother was told that she could not be in the room. A nurse later informed Mother that she had to call CPS. While Ashley was receiving medical attention, Mother called her mother, Beth; Mary; and Frank to inform them that CPS was being called.

While waiting in the lobby during Ashley's first surgery, Mother testified that she spoke with Danitra Fields-Frazier, a specialized investigator with the Department. Fields-Frazier was called because the hospital staff believed that Ashley was physically abused. Mother detailed the events leading up to the hospital visit and expressed that Ashley had fallen from a chair when her and Nancy were playing. According to her testimony, Mother alleged that Ashley had fallen from a folding chair. But, she acknowledged that this was not what she told Fields-Frazier when questioned at the hospital. During her interview with Fields-Frazier, Mother suggested that Ashley had fallen from a swivel chair. She described Ashley and Nancy spinning each other before Ashley fell. Mother also testified that she spoke with two other investigators at the hospital—Kelly North, a special investigator for the Department, and Luke Littler, a detective with the Houston Police Department. She repeated the version of events involving the swivel chair to North and Littler. Mother later acknowledged that there was not a swivel chair in the house.

4

Frank testified at trial. He recalled speaking with North and Littler the night the children were removed and described what happened to Ashley. According to Frank, Ashley tripped between the chairs and got trapped. In Frank's version of events, he did not observe Ashley and Nancy playing on a spinning chair and insisted that the chair was a metal "party" chair. Frank explained that he was in the bedroom at the time of the incident and heard Ashley crying after she allegedly fell. When he went to check on her, he asserted that he and Mother found Ashley bent in the middle of the collapsed folding chair. He carried her to the bedroom and checked her stomach. He saw one "little" bruise. Mary also came to check on Ashley. She rubbed Ashley's stomach and gave her some chamomile tea. Frank stated that Ashley started throwing up after she drank the tea. Frank then took Ashley to the restroom, and she continued to vomit. Once Ashley was feeling better, he and Mother got Ashley ready for bed.

Frank woke up around 3:00 a.m. and noticed that Ashley was still complaining about her stomach. She needed to defecate but was only able to urinate. While Mother slept, Frank avowed that he stayed up taking care of Ashley. Around 4:00 a.m. or 5:00 a.m., Ashley went to the restroom and vomited again. Frank testified that Ashley vomited a total of three times throughout the night. Frank expressed that he was worried when Ashley started looking pale. He described Ashley as "looking like . . . a zombie . . . [with] bags under her eyes." Frank woke Mother up and told her that she needed to take Ashley to the hospital because Ashley "started to look bad." He did not recall the time but confirmed that the sun was already out. While Mother was getting ready, Frank saw that the small bruise on Ashley's stomach had gotten bigger and looked black. Frank attested that Mother and Ashley left for the hospital around 9:30 a.m. The next time he spoke to her was when Mother called and said she was no longer able to have contact with Ashley.

During the time leading up to Ashley's hospitalization, Frank testified that Ashley experienced behavioral problems when she would return from visiting Abraham's mother's house. Frank stressed that Ashley would have an attitude and tell him that he was not her dad. Frank asserted that he never spanked Ashley, but he did yell at her when she would tell him not to talk to her or when she would do something "mischievous." Frank claimed that Ashley was not scared of him, but he told North that he stopped yelling at Ashley because his voice scared her. Frank also detailed how Ashley got the burn on her hand, which aligned with Mother's version of events. Despite not remembering his father's date of birth or the name of the restaurant, Frank claimed that he, Mother, and the children were at a Mexican restaurant to celebrate his father's birthday when the burn occurred. Frank explained that Mother was in the restroom with Ashley and Nancy, and Frank heard screaming. Frank's father did not hear the scream. Mother returned with Ashley and Nancy and told him that Ashley burned her hand when the girls were playing with the water. After leaving the restaurant, Frank asserted that he helped Mother put mustard on the burn. According to Frank, Mother later contacted the pediatrician, but it was not the same day.

The Department called Dr. Christine Matthew, Ashley's pediatrician, to testify at trial. Dr. Matthew asserted that she had a virtual visit with Mother concerning the burn on Ashley's hand on January 13. Based on her notes, Dr. Matthew recalled that the burn was caused by hot water spilling on Ashley's left hand. She did not call CPS because she believed Mother's explanation was credible. Dr. Matthew prescribed an antibiotic cream and also referred Mother to the Wound Care Clinic because the burn involved joints. Mother later sent a MyChart electronic message indicating that she was unable to get the antibiotic cream because she did not have Ashley's medical identification number. Dr. Matthew gave Mother a school

excuse for the days that Mother kept Ashley out of school but maintained that she did not tell Mother to keep Ashley out of school. Following Ashley's hospitalization, Dr. Matthew was contacted by a CPS caseworker. Dr. Matthew described the visit concerning the burn to the caseworker. She told the caseworker that Mother mentioned that the burn occurred "while [Ashley] was in the kitchen and hot water spilled onto her hand when she was in a restaurant." Dr. Matthew agreed that Mother's statement about being in the kitchen when the burn occurred was different than being in the restaurant bathroom where Ashley allegedly burned her hand with hot water.

Dr. Ashley Gibson testified as a witness for the Department. Notwithstanding Mother's objection, the trial court permitted Dr. Gibson to testify as an expert witness in child maltreatment. Dr. Gibson provided her experience and education and stated that she was employed as an assistant professor with the Department of Pediatrics Division of Child Safety and Integrated Care, also known as the CARE Team. The CARE Team consults with CPS to give assessments when there are concerns of abuse or neglect. Dr. Gibson was asked by the doctors in the pediatric intensive care unit to give an assessment after Ashley's first surgery. Dr. Gibson reviewed the surgeons' and social worker's notes and spoke with Mother. The surgeons noted that the injuries were consistent with significant blunt force trauma to the abdomen, specifically a strike or a hit. Based on the foregoing, Dr. Gibson prepared a report for CPS, which was admitted into evidence. The report outlined Mother's explanation of how Ashley sustained her injuries and also discussed the severity of Ashley's injuries. Ashley had multiple bruises on the outside of her abdomen, bruises on her legs and the middle of her back, two perforations through the walls of her small intestine with bruising on the surrounding tissue, and an injury to the outer wall of the transverse colon where the outer tissue was avulsed. There

7

was also infected and feculent fluid inside Ashley's abdomen. Without surgery, Dr. Gibson opined that Ashley would have died from the infection caused by her injuries. According to Dr. Gibson, Ashley's injuries were not consistent with falling from a spinning chair or having a chair fold on her. She expounded that it would take a lot of direct force to the abdomen to cause Ashley's injuries. Neither Mother's nor Frank's description of the incident explained Ashley's injuries. Because no valid explanation was offered for Ashley's significant injuries, Dr. Gibson concluded that Ashley was physically abused.

Fields-Frazier testified as a witness for the Department. As mentioned, Fields-Frazier is a specialized investigator with the Department. She received a "Priority 1" call from the hospital on January 22. She explained that when a "Priority 1" call is received, she is required to make immediate contact if the call involves serious injury. Fields-Frazier made immediate contact, and the first person she spoke to was Mother. Before speaking with Mother, Fields-Frazier was already aware there were allegations of serious injury involving a five-year-old child who was currently in surgery. When Fields-Frazier asked Mother if she knew what happened to Ashley, Mother told her that Ashley fell out of a chair. Mother explained that Nancy was spinning Ashley in a chair and then Mother heard a loud noise. Mother did not see Ashley fall, but when she went into the room, she saw Ashley and the chair on the floor. After the purported fall, Mother gave Ashley some tea. Mother described Ashley's stomach as "hard" and indicated that she decided to take Ashley to the emergency room the following day when she realized that Ashley was unable to use the restroom. Mother also said that the day before the accident, Ashley had a stomachache and vomited after eating some spicy chips.

While interviewing Mother, Fields-Frazier left the room to speak with the doctors. The doctors updated Fields-Frazier on the status of Ashley's injuries,

revealed that Ashley had three holes in her intestines, and indicated that the injuries were caused by blunt force trauma. When Fields-Frazier returned, North and Littler were questioning Mother. Mother told North and Littler that Ashley sustained her injuries when she fell out of a spinning chair. Based on her years of experience and training, Fields-Frazier testified that she decided to take steps to remove the children from the home because she was concerned that the children were in immediate danger. Fields-Frazier explained that Mother's explanation of events did not explain to the injuries Ashley sustained, and the doctors indicated that Ashley's injuries were caused by blunt force trauma. Fields-Frazier was also concerned that the burn on Ashley's hand was caused by physical abuse. According to Fields-Frazier, she received different stories about the injury. Mother told her that the burn happened at a Mexican restaurant in the restroom. Ashley was trying to wash her hands, and Nancy accidentally cut the hot water on. Dr. Matthews told Fields-Frazier that Ashley was burned when a pot of boiling water fell on Ashley's hand at Frank's job.

After leaving the hospital, Fields-Frazier went to Mother's home with a human service technician to assist with transportation of the children. Frank, Frank's mother, law enforcement officers, North, and the other children were all present. Fields-Frazier testified that she did not see a spinning chair in the home. However, she did have an opportunity to briefly speak with Frank and asked him to identify the chair that Ashley fell from. Frank showed Fields-Frazier a folding chair, which did not align with Mother's version of events involving the spinning chair. Fields-Frazier testified that she also had an opportunity to speak with Ashley after her second surgery. She described Ashley as shy but was able to build a rapport with her. Fields-Frazier drew a picture of Mother, Frank, and Abraham's sister, pointed to each figure, and asked Ashley if any of them hurt her. Ashley did not speak, but she pointed to the "stick man" that represented Frank. After setting up a forensic

9

interview for Ashley and Nancy, Fields-Frazier turned the investigation and all her notes over to a conservatorship caseworker. Based on the investigation, the Department determined there was reason to believe that physical abuse and neglectful supervision had occurred.

The Department called Erika Arguellas as a witness. Arguellas was employed as an advocacy coordinator with Child Advocates and served as the guardian ad litem for the children. During one of her visits with Ashley, she asked if Ashley could draw a picture of the individuals she lived with before being placed in her current home. Ashley drew stick figures of what appeared to be two adults and three children. After Ashley identified the two adult stick figures as Mother and Frank and the other three stick figures as Nancy, Adam, and Sarah, Arguellas asked Ashley if she was afraid of anyone in her current or previous home. Ashley pointed to the stick figures representing Mother and Frank. Ashley indicated that she was afraid because Mother and Frank hit her. Ashley demonstrated how she was hit by balling her hand into a fist and making contact with her stomach area. Arguellas asked Ashley what happened after Mother and Frank hit her. Ashley expressed that she cried a lot and then went to the hospital. Ashley did not indicate that she was afraid of anyone in her current placement. Arguellas also testified that she reviewed the affidavit attached to the petition, communicated with the caseworkers and attorneys, and met with the foster parents. She recommended the termination of parental rights and that the Department be appointed as the permanent managing conservator of the children. Arguellas also recommended that the children remain at their current placements.

Of the three foster homes that Ashley and Nancy were placed in, the foster parents from the second and third homes both testified at trial.[3] Foster Parents No. 2

---

[3] At trial, the foster parents were not identified by name. For clarity, we collectively refer to Foster Mother No. 2 and Foster Father No. 2 as "Foster Parents No. 2" and collectively refer to

both described the girls' overall disposition. Ashley was very quiet and took a little while to warm up, while Nancy was more outgoing and talkative. According to Foster Parents No. 2, the girls provided information on the injuries Ashley sustained and the living conditions of their home with Mother. First, Ashley described the burn on her hand. She did not go into the specifics of how the injury occurred, but Ashley stated that Frank caused the injury with hot water. Foster Parents No. 2 emphasized Ashley's fear of hot water. Next, Nancy expressed that there were bugs everywhere at their home with Mother. Foster Parents No. 2 described Nancy's fear of bugs. Lastly, Ashley disclosed the nature of her abdominal injuries and asserted that "Mommy hit me." After Ashley identified Mother as the perpetrator, Nancy confirmed that Mother hit Ashley.

Foster Parents No. 3, who intervened in the case, testified that Ashley and Nancy both made outcries. Ashley told Foster Parents No. 3 that Mother hit her. Ashley laid on the bed and demonstrated how she was hit in the stomach. Foster Parents No. 3 asked Ashley how many times she was hit, and Ashley replied that she was hit five times. Afterwards, Ashley described what Frank did to her hand. She was at a fast-food restaurant with Frank. She got upset and began to cry. Frank told her to wash her hands and turned on the hot water. When Ashley felt the hot water, she jumped back, but Frank pushed her into the sink and her hand back under the hot water.

North, a special investigator for the Department; Littler, a detective with the Houston Police Department; and Daisy Vidal, a caseworker assigned to all four children, each testified for the Department during its case-in-chief. North and Littler each recounted Mother's explanation of Ashley's injuries purportedly involving the

---

Foster Mother No. 3 and Foster Father No. 3 as "Foster Parents No. 3."

11

swivel chair. Littler also testified about the criminal charges pending against Mother for serious bodily injury to a child. Vidal testified that Ashley and Nancy expressed their desires to remain with Foster Parents No. 3 and that Adam and Sarah were "thriving" in their respective placements. Vidal also explained that Beth was not a suitable relative for placement because she did not believe that Mother or Frank hurt Ashley. There were also concerns if Beth would protect the children.

After the Department rested, Mother presented her case-in-chief. She offered the testimony of Beth. Beth testified generally about her relationship with Mother and her grandchildren before discussing Ashley's injuries. According to Beth, she regularly talked to Ashley and Nancy on the telephone, but the last time she saw Ashley or any of her siblings was on Christmas in 2021. She did not notice anything that caused her concern when speaking with Ashley and did not know about the burn on Ashley's hand until the children were removed. Beth testified that she learned of Ashley's injury on January 22. Mother sent a message stating that Ashley had not been able to sleep because her stomach was hurting. Once Ashley was in the hospital, Beth stated that she wanted to see Ashley but was denied access.

Once Mother learned that the children were going to be removed, she asked Beth if she would be willing to take the children. The first person from CPS that Beth spoke to was JeJuan Cryer, a conservatorship caseworker. Cryer made an appointment to come to Beth's house and questioned if she would be willing to take care of her grandchildren. Cryer told Beth that Ashley suffered a significant injury and suggested that Mother was the cause. Beth testified that she did not believe him because she knew that Mother would never hit her children. Nonetheless, Beth claimed that she would have been protective of the children if they had been placed with her. Beth also agreed to get her driver's license, child proof the home, and complete a home study because she believed the children were going to be placed

12

with her. Ultimately, the children were not placed with her. On cross-examination, Beth asserted that she did not believe it was necessary for Mother's visits with the children to be supervised. Even after she learned the severity of Ashley's injuries, Beth testified that she did not understand why Mother was not allowed to see Ashley. There was also testimony that suggested Beth was not truthful about the last time she saw her grandchildren. Mother purportedly told North that she was at Beth's house until 11:30 p.m. the night before Ashley was hospitalized, indicating that Beth would have possibly witnessed what happened to Ashley and seen the burn on her hand, or could have possibly been the perpetrator.

During his case-in-chief, Frank testified briefly. He offered several exhibits, including photographs, paystubs, and lease agreements. He acknowledged that he heard the testimony about him putting Ashley's hand under hot water but denied that he hurt her. Frank asserted that he had never been accused of causing the burn on Ashley's hand until trial. Frank also called Dr. Gibson to testify about the nature of Ashley's injuries. Frank sought for the trial court to take judicial notice of a document from the Consumer Product Safety Commission, but the trial court declined and sustained the Department's hearsay objection. Frank questioned if Ashley's injuries could have been caused by a folding chair, and Dr. Gibson reiterated that Ashley's injuries were not caused by the chair.

## II.    The Jury Verdict

After the parties rested, Abraham entered into a partial Rule 11 agreement with the Department and the intervenors. In the Irrevocable Partial Rule 11 Settlement Agreement for Final Order, Abraham stipulated, among other things, that there was a material and substantial change of circumstances, the agreement was in the best interest of the children, and that he executed an affidavit of voluntary relinquishment of his parental rights as to Ashley and Nancy. The parties also agreed

13

that the Department would be appointed as permanent sole managing conservator and allow grandparent access for Abraham's mother.

The charge conference was held on June 29. Once the parties agreed to the jury charge, they gave their closing arguments, and the jury retired to deliberate. On June 30, the jury's verdict was read. The jury found by clear and convincing evidence that Mother's and Frank's parental rights should be terminated on predicate grounds of endangerment and failure to comply with the court-ordered service plan for reunification. The trial court accepted the jury's verdict and signed its final orders terminating Mother's parental rights to her four minor children and terminating Frank's parental rights to Sarah. Mother filed a motion for new trial, which was heard and denied by the trial court. Mother and Frank each filed a notice of appeal.

### *Standards of Review*

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *In re I.L.G.*, 531 S.W.3d 346, 357–58 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. *Id.* (citing *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)). The children's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *Id.* Due to the severity and permanency of the termination of parental rights, Texas requires clear and convincing evidence to support such findings. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

As discussed, Mother and Frank both challenge the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings and

14

its best interest determination, Mother contests the trial court's conservatorship order, and Frank argues that he received ineffective assistance of counsel.

When reviewing a legal sufficiency challenge under the clear and convincing evidentiary standard, we examine all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all contrary evidence that a reasonable factfinder could have disbelieved. *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In reviewing termination findings for factual sufficiency, we consider and weigh all the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the factfinder's findings and do not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). As always, the trier of fact is the sole judge of witness credibility. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re T.L.E.*, 579 S.W.3d 616, 626 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

We review managing conservatorship orders for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re R.T.K.*, 324 S.W.3d 896, 899 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). A court abuses its discretion when

15

it acts unreasonably, arbitrarily, or without reference to guiding principles. *In re R.T.K.*, 324 S.W.3d at 899; *see also Swaab v. Swaab*, 282 S.W.3d 519, 529 (Tex. App.—Houston [14th Dist.], 2008, pet dism'd w.o.j.). In this context, legal and factual sufficiency challenges are not independent grounds of error; instead, they are factors to be considered in determining whether the trial court abused its discretion. *See In re Marriage of Butts*, 444 S.W.3d 147, 153 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Baltzer v. Medina*, 240 S.W.3d 469, 475 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Ineffective assistance of counsel claims in parental-termination cases, as in criminal cases, are governed by the United States Supreme Court's two-prong test articulated in *Strickland v. Washington*. *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021); *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). To establish ineffective assistance of counsel, Frank must prove by a preponderance of the evidence that (1) his trial counsel's representation was deficient in that it fell below the standard of prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *See In re D.T.*, 625 S.W.3d at 73; *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003).

"An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm." *In re M.T.R.*, 579 S.W.3d 548, 574 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (citing *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)). We do not limit our review to a single portion of the representation but examine the totality of the representation to determine counsel's effectiveness. *In re K.L.*, 91 S.W.3d 1, 14 (Tex. App.—Fort Worth 2002, no pet.).

*Predicate Termination Findings*

As Mother's first two issues and Frank's second issue, they challenge the legal and factual sufficiency of the evidence to support the trial court's findings that termination is warranted under Family Code subsections 161.001(b)(1)(D) and (E). Under these provisions, courts are authorized to terminate parental rights respectively if the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D), (E). Only one predicate finding under section 161.001 is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam).

Predicate findings under subsections D and E, however, pose significant collateral consequences. *See id.* at 234–35 (discussing section 161.001(b)(1)(M), which provides that a court may terminate a parent's rights if it finds, by clear and convincing evidence, that the parent has had their "parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)."). In light of these consequences, we are required to consider the sufficiency of the evidence pursuant to subsections D or E when raised on appeal. *Id.* at 235; *see also, e.g., In re P.W.*, 579 S.W.3d 713, 721, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Both subsections D and E require proof of endangerment. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). "Endanger" means to expose the children to loss or injury or to jeopardize the children's emotional and physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Children are considered endangered when the environment creates a potential for danger that the parent is aware of but consciously

disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *In re M.C.*, 917 S.W.2d at 269. But, it is not necessary that the endangering conduct be directed at the children or that the children actually suffered injury. *Id.*

While both subsections D and E focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the children. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). For instance, subsection D focuses on the children's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the children's environment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Whereas, subsection E focuses on the parent's conduct, which must be the result of a conscious course of conduct rather than a single act or omission. *Id.* Because Mother's conduct is of particular importance, we begin our analysis by determining if the evidence is legally and factually insufficient to support the trial court's termination of her parental rights under subsection E.

Without question, direct physical abuse of children endangers them under subsection E. *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *8 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.); *see also In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being."). Further, the physical abuse of one child in the home supports a finding of endangerment as to the other children also present in the home, even when the other children are not the direct victims of the physical abuse in question. *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston

[1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (citing *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at \*16 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.)).

Here, there is clear and convincing evidence that Mother and Frank endangered the children by physically abusing Ashley. Ashley sustained multiple bruises on the outside of her abdomen; bruises on her legs and the middle of her back; two perforations through the walls of her small intestine with bruising on the surrounding tissue; an injury to the outer wall of the transverse colon where the outer tissue was avulsed; and a burn on her left hand. At trial, five photographs of Ashley's injuries at the time she had surgery were admitted into evidence. In the first photograph, which was taken before the first surgery, several large bruises are seen on Ashley's abdomen. Several of these bruises are certainly bigger than the "quarter" that Mother described. In two of the photographs, which were taken after the first surgery, Ashley is sedated and intubated. Her abdomen is open, and a large abdominal wound vac is attached. The remaining two photographs portray the burn on Ashley's left hand.

Five outcry witnesses testified that Ashley told them that Mother caused the abdominal injuries, and Frank caused the burn injury. Fields-Frazier testified that she drew a picture of Mother, Frank, and Abraham's sister. She pointed to each figure and asked Ashley if any of them hurt her. Ashley did not speak, but she pointed to the "stick man" that represented Frank. Arguellas testified that Ashley drew stick figures of what appeared to be two adults and three children. After identifying the two adult stick figures as Mother and Frank, and the other three stick figures as her siblings, Ashley pointed to the stick figures representing Mother and Frank and indicated that she was afraid of them because they hit her. Foster Parents No. 2 detailed Ashley's fear of hot water and explained that Ashley would cry if they

tried to bathe her in water that was warmer than lukewarm. They also indicated that Ashley and Nancy identified Mother as the cause of the abdominal injuries. Foster Parents No. 3 testified that Ashley disclosed that she was hit five times in the stomach area. Ashley laid on a bed and recreated how Mother hit her. Later, Nancy confirmed that Mother hit Ashley. Ashley also revealed the specifics of how she sustained the burn on her hand, explaining that Frank held her hand under hot water at a fast-food restaurant.

Though Mother and Frank offered explanations for Ashley's injuries, albeit conflicting accounts, Dr. Gibson testified that Mother's and Frank's accounts did not explain Ashley's abdominal injuries, which were consistent with significant blunt force trauma, like a strike or a hit. Dr. Gibson maintained that these injuries were not consistent with falling from a spinning chair or having a folding chair collapse, as Mother suggested. To the contrary, Dr. Gibson testified that Ashley would have had to fall multiple stories—with each story being ten to twelve feet—to sustain such injuries. While Dr. Gibson was not able to conclude that the burn on Ashley's hand was the result of child abuse, there were concerns that Mother's statements were not truthful. There was evidence admitted at trial that Mother first told Abraham that Ashley burned her hand at a fast-food restaurant where Frank worked but later testified that the burn happened at a Mexican restaurant while Ashley was washing her hands. Likewise, Frank testified that the burn occurred at the Mexican restaurant on his father's birthday but could not recall his father's date of birth or the restaurant where the injuries purportedly happened.

Mother provides little in the way of substantive analysis under her first issue, arguing generally that the facts do not support termination under subsection E. In her brief, Mother acknowledges that the photographs "leave no doubt that [Ashley] suffered trauma both as to her stomach and left hand" and that Mother's and Frank's

20

"story of an accidental falling from a folding or swivel chair is not consistent with the injuries." Nevertheless, and without citing any authority, Mother asserts that the evidence was legally and factually insufficient to support termination under subsection E because her criminal case has not yet concluded. But, the relevant inquiry under subsection E is whether evidence exists that the endangerment of the children's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Reviewing the entirety of the record, there is substantial evidence that Mother engaged in a voluntary, deliberate, and conscious course of conduct that endangered the children's physical and emotional well-being. *In re P.M.B.*, 2017 WL 6459554, at *8; *In re J.I.T.P.*, 99 S.W.3d at 845.

Similarly, Frank does not provide much argument to support his second issue. The evidence adduced at trial indicates that Frank may not have been truthful about how Ashley sustained the burn on her hand. As discussed, Frank alleged that the burn happened in the restroom of a Mexican restaurant, but several other witnesses indicated that Ashley burned her hand while at a fast-food restaurant. Further, Ashley identified Frank as a person who hurt her on multiple occasions. Frank suggests that the evidence is legally and factually insufficient because he was considered as a placement by the Department but for his living arrangements with Mother, but this contention is not remotely supported by the record. Reviewing the record, the Department considered multiple kinship placements for the children, including Abraham's mother. Vidal testified that Abraham was on probation and living with his mother. This home was not considered a safe home because of Abraham's criminal history and drug use. But, if Abraham had moved out of his mother's home, it would have been possible for the Department to do a home study

21

of his mother's home as possible placement for the children. The record does not support Frank's contention that he was ever considered as a placement for the children, especially since Ashley identified him as one of the persons that hurt her. As such, there is substantial evidence that Frank engaged in a voluntary, deliberate, and conscious course of conduct that endangered the children's physical and emotional well-being. *In re P.M.B.*, 2017 WL 6459554, at *8; *In re J.I.T.P.*, 99 S.W.3d at 845.

Based on the foregoing analysis, the evidence was legally and factually sufficient to support the trial court's predicate finding of endangerment under section E. *See* Tex. Fam. Code § 161.001(b)(1)(E). We therefore need not consider Mother's and Frank's challenges to the evidence supporting a finding of endangerment under subsection D or failure to comply with the provisions of a court order under subsection O. *See, e.g.*, *In re P.W.*, 579 S.W.3d at 728.

Accordingly, we overrule Mother's first two issues and Frank's second and third issues.

### *Best Interest Finding*

We now turn to Mother's third issue and Frank's fourth issue challenging the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest. There is a strong presumption that the best interest of the children is served by keeping the children with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). The party requesting termination bears the heavy burden of rebutting that presumption. *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). No specific set of facts is required to establish that termination is in the best interest of children, but there are several nonexclusive factors that may guide the factfinder's best-interest determination. *See In re L.M.*, 572 S.W.3d 823, 837 (Tex. App.—Houston

[14th Dist.] 2019, no pet.). These factors include: (1) the desires of the children; (2) the children's emotional and physical needs now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the children; (6) the plans for the children by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating a parent's willingness and ability to provide the children with a safe environment). The same evidence used to establish grounds for termination under section 161.001(b)(1) may be probative in determining the best interest of the children. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

**The children's desires.** At the time Mother's and Frank's parental rights were terminated, Ashley was six years old, Nancy was five years old, Adam was nearly four years old, and Sarah was about two years old. Ashley and Nancy have been in their current placement with their foster parents since June 2022. Ashley had not seen Mother since the date she was hospitalized and expressed her desire to not see Mother. Foster Parents No. 3 testified that the two girls refer to them as "mommy" and "daddy" and expressed their desire to adopt the two young girls. According to the permanency report prepared by the Department, both Ashley and Nancy are bonded and comfortable with their foster parents and refer to the other child in the home as their "baby brother." Ashley has made significant progress while being in

the home, and Nancy is excited to start school. Arguellas testified that both girls expressed their desire to remain at their current placement with their foster parents.

Adam and Sarah are too young to express their desires. Vidal testified that Adam has been at his current placement since he was two years old. She explained that he is thriving and receiving all necessary services. There was no testimony about how long Sarah has been with her current placement, but there is evidence that she is bonded with her foster parents.

**Emotional and physical needs and danger.** The children's need for a safe and stable home is the paramount consideration in assessing the best interest of the children. *See* Tex. Fam. Code § 263.307(a) (providing that prompt and permanent placement of children in a safe environment is presumed to be in the children's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (providing that parent who lacks ability to provide children with safe and stable home is unable to provide for the children's emotional and physical needs). Evidence of violence in the home supports a finding that the placement of children with their parent is likely to subject the children to emotional and physical danger now and in the future. *In re J.S.-A*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.); *In re O.N.H.*, 401 S.W.3d 681, 685 (Tex. App.—San Antonio 2013, no pet.) ("[I]t was a form of abuse for the children to be exposed to an environment where physical abuse occurred even if it was not directed toward them."). The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the children. *In re C.H.*, 89 S.W.3d at 28; *In re D.R.A.*, 374 S.W.3d at 533.

In this case, the jury was permitted to consider the evidence of physical abuse recited above, as well as Mother's and Frank's truthfulness regarding the incident

that led to removal. *See In re S.R.*, 452 S.W.3d at 360. Specifically, Mother provided conflicting explanations of how Ashley sustained her abdominal injuries. Initially, Mother manufactured a narrative involving a spinning chair, repeated the story to several investigators, and then later admitted that there was not a spinning or swivel chair in the house. At trial, Mother and Frank testified about the incident and provided an explanation involving a metal folding chair. A medical expert testified that neither Mother's nor Frank's explanations were consistent with Ashley's injuries. Indeed, Ashley's injuries were consistent with significant blunt force trauma and were so severe that the medical expert opined that Ashley would have to fall multiple stories to sustain similar injuries. Notably, Ashley and Nancy both made outcries identifying Mother as the person who caused Ashley's abdominal injuries. Both girls described Mother hitting Ashley in the stomach area, which is consistent with the medical expert's opinion.

Mother also fabricated a narrative concerning the burn on Ashley's hand. Prior to trial, Mother told Abraham that Ashley burned her hand at a fast-food restaurant where Frank worked. At trial, Mother testified that Ashley was washing her hands at a Mexican restaurant, and Nancy accidentally cut the hot water on. Though the medical expert could not definitively testify that the burn was the result of child abuse, Ashley identified Frank as the person who caused the burn injury and articulated that he held her hand under hot water, even when she tried to pull away. Vidal testified that Ashley's and Nancy's emotional and physical needs are being met with Foster Parents No. 3. Regarding Adam and Sarah, Vidal generally testified that Adam's and Sarah's emotional and physical needs are being met in their current placements.

**Parenting abilities.** A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and

poor judgment may be considered when looking at the children's best interest. *In re J.D.*, 436 S.W.3d at 119. Abusive conduct is also relevant to a parent's parental abilities and her abilities to care for her children's needs. *In re C.A.*, No. 05-18-00645-CV, 2018 WL 5905634, at \*14–15 (Tex. App.—Dallas Nov. 12, 2018, no pet.) (mem. op.).

There was evidence that Mother and Frank completed their parenting classes; refrained from any involvement in criminal activity (besides Mother's ongoing criminal case regarding injury to a child); participated in drug and alcohol testing, a psychosocial assessment, and individual counseling; interacted appropriately during visitation with the three youngest children; and presumably demonstrated an increased understanding of appropriate parenting techniques. But, there was also evidence that Ashley identified Mother and Frank as persons who physically abused her and that neither Mother nor Frank demonstrated any remorse for their actions or otherwise acknowledged the outcries made by Ashley and Nancy.

As for the respective foster parents' abilities, evidence indicates that the children have shown improvement while in their care. Arguellas testified that Foster Parents No. 3 take Ashley and Nancy to therapy. She described Ashley as a "completely different little girl." According to the permanency report, Ashley and Nancy have made significant progress while being in their current placement and are bonded and comfortable with their foster parents. Both girls expressed that they feel safe and happy in their home. Vidal testified that Adam has an autism diagnosis and is thriving in his current placement where he is receiving all necessary services. Adam's foster parent is an educator and was able to very quickly identify Adam's needs and obtain services. Sarah is developmentally on target, attending all of her doctors' appointments, and bonded with her current foster parents.

The foster parents for the children also encourage and participate in sibling

visits so that the children are able to maintain their bond. In addition to the visits scheduled by the Department, the foster parents make additional arrangements for the children to see each other every two weeks and also coordinates virtual visits. Adam's foster parents also cooperate with Andrew for his visits.

**Programs available to assist.** There is little evidence in the record regarding programs that are available to those seeking custody of the children. While it is clear that Mother and Frank have been actively engaged in services offered to them, Vidal testified that there are not any services that the Department could recommend when a parent is accused of physical abuse of a child.

Regarding the children, Ashley attends trauma and play therapy, whereas Nancy participates only in play therapy. Adam's foster parents were able to enroll him at Action Behavior School (ABS). At ABS, Adam receives speech, occupational, physical, and applied behavior analysis (ABA) therapy. Vidal testified that this is an "expensive" service that the Department does not pay for, but the foster parents pay for it anyway because Adam needs it.

**Plans for the children.** The fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party are realistic or weak and ill-defined. *In re J.D.*, 436 S.W.3d at 119–20 (citing *D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ)).

There is little evidence in the record concerning Mother's or Frank's plans for the children, though they presumably want the children to be returned to their care. When the children were removed from Mother's and Frank's care, Mother did ask Beth if she would be willing to take the children. The Department, however, determined that Beth was not a suitable placement for the children. She was denied in part because she did not believe that the children were abused or neglected by

27

Mother or Frank, and the Department did not believe that Beth would protect the children from Mother. The Department also evaluated several other relatives for possible kinship placement, but each of these relatives was denied.

As for the respective foster parents' plans, Ashley and Nancy's foster parents expressed their desire to adopt both young girls. Foster Parents No. 3 take the girls to therapy, ensure the girls' physical and emotional needs are met, and encourage the girls to participate in extracurricular activities. There is evidence that Adam's foster parents are committed to improving his educational and developmental needs. As mentioned, they enrolled him in ABA therapy at their own expense. Vidal identified that Sarah's current placement is "adoptive," meaning that her foster parents are willing to be a long-term placement.

**Stability.** The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the children's best interest. *In re A.G.*, No. 14-18-01089-CV, 2019 WL 2385723, at *5 (Tex. App.—Houston [14th Dist.] June 6, 2019, pet. denied). Texas courts recognize that a child's need for permanence through the establishment of a "stable, permanent home" is a paramount consideration. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement informs the best-interest determination. *See In re C.H.*, 89 S.W.3d at 28.

In this case, there is some evidence that Mother does not pay rent, but she has stable employment and maintains stable housing. Mother testified that she resides with Frank, Mary, and Samantha (Frank's minor sister). There is evidence that Frank has maintained a stable home and employment. However, the record contains substantial evidence that Mother and Frank failed to provide a safe physical home environment by demonstrating violent behavior towards Ashley. *See In re P.S.*, No. 02-16-00458-CV, 2017 WL 1173845, at *9 (Tex. App.—Fort Worth Mar. 30, 2017,

28

no pet.) (mem. op.) (explaining that children's basic needs include safe and stable home environment). Additionally, Mother has an active criminal case, which is certainly relevant to the stability of Mother's home.

As for the foster parents, the record reflects that the current placements for the children provide safe, stable, and nurturing environments. There is no indication that any of the foster parents in the children's current placements has a criminal record or a record with the Department. In her brief, Mother acknowledges that the "foster families have all the resources they need to successfully raise the[] children."

**Acts and omissions of the parent and any excuses.** Mother's and Frank's relevant acts and omissions have largely already been discussed. As stated in detail, there is evidence that Ashley was the victim of physical abuse and sustained life-threatening injuries while in Mother's and Frank's care. Mother and Frank continued to blame Ashley as the cause of her own injuries, despite medical testimony to the contrary.

**Conclusion.** Reviewing the record, a reasonable fact finder could have formed a firm belief or conviction that termination was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344. It would have been reasonable for the trial court to conclude that Mother and Frank lack the ability to provide a safe and stable environment and successfully parent the children. This is supported by evidence of Mother's acts towards a five-year-old child that resulted in two surgeries, Frank's act of holding a child's hand under hot water, Mother's failure to protect her child from her boyfriend's physical abuse, Mother's and Frank's explanations of how Ashley sustained life-threatening injuries, and Mother's and Frank's inability to acknowledge that their explanations of the injuries were inconsistent with the medical testimony. Additionally, the evidence strongly suggests that the children are thriving and have greatly improved in their current placements, and adoption appears

29

to be the next logical step for the children.

Accordingly, we overrule Mother's third issue and Frank's fourth issue challenging the sufficiency of the evidence to support the trial court's best interest finding under Family Code section 161.001(b)(2).

## *Conservatorship*

As her final issue, Mother contends the trial court abused its discretion when it appointed the Department as the children's sole managing conservator. We have previously held that when evidence is sufficient to support parental termination, a trial court does not abuse its discretion in appointing the Department as the children's sole managing conservator. *See C.M.M. v. Dep't of Fam. & Protective Servs.*, No. 14-21-00702-CV, 2022 WL 1789925, at *16 (Tex. App.—Houston [14th Dist.] June 2, 2022, pet. denied) (mem. op.); *In re T.N.R.*, No. 14-21-00473-CV, 2022 WL 370035, at *7 (Tex. App.—Houston [14th Dist.] Feb. 8, 2022, no pet.) (mem. op.). Because we affirm the trial court termination of Mother's rights to the children, we cannot say that the trial court abused its discretion in appointing the Department as the children's sole managing conservator. Accordingly, we overrule Mother's final issue.

## *Ineffective Assistance of Counsel*

As his first issue, Frank alleges that he received ineffective assistance of counsel. As discussed above, only Mother filed a motion for new trial. When a claim for ineffective assistance of counsel is raised for the first time on direct appeal, the record "is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance." *In re J.J.*, 647 S.W.3d 524, 530 (Tex. App.—Texarkana 2022, no pet.). Frank bears the burden of demonstrating a reasonable probability his parental rights would not have been terminated if not for

30

his trial counsel's conduct. *See In re V.V.*, 349 S.W.3d 548, 559–60 (Tex. App.— Houston [1st Dist.] 2010, pet. denied). In his brief, Frank identifies two categories in which his trial counsel was deficient: (1) errors in trial strategy and (2) inadequate development of evidence.

**Trial Strategy.** Frank faults his trial counsel for failing to call Mary (his mother) as a witness. According to Frank, his trial counsel interviewed Mary and had reason to believe her testimony could corroborate and strengthen his testimony. Yet, Frank argues that his trial counsel did not take the opportunity to call Mary as a witness. Frank, however, does not identify what Mary's potential testimony would have revealed or cite to any authority to support this contention. We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for her actions. *In re Z.M.R.*, 562 S.W.3d 783, 793–95 (Tex. App.—Houston [14th Dist.] 2018, no pet. h.) (mem. op.). We must indulge in the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *M.S.*, 115 S.W.3d at 549. That presumption also insulates Frank's trial counsel's decision to not call Mary as a witness, especially since Mary resided at the residence where Ashley was injured and could have revealed the true nature of Ashley's injuries.

**Development of Evidence.** Frank acknowledges that his trial counsel objected to Foster Parents No. 2's testimony regarding Ashley's outcries that Frank caused the burn on her hand but complains that his counsel could have argued that the Department withheld this information from discovery. Again, Frank cites no authority to support this contention, nor does he provide any argument that the result of the proceeding would have been different, but for trial counsel's alleged error. *See id.* at 550. In any event, there was evidence indicating that Frank was one of the persons that hurt Ashley and that he worked at a fast-food restaurant where she

sustained her injury. As such, any error would have been harmless because the record does not affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *See L.G.R.*, 498 S.W.3d at 209.

Accordingly, we overrule Frank's first issue.

### *Conclusion*

We affirm the judgment of the trial court terminating the parental rights of Mother and Frank to the children and appointing the Department as sole managing conservator.


/s/ Frances Bourliot
Justice


Panel consists of Justices Bourliot, Zimmerer, and Spain.